# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

**BYRON BENOIT**                                          **CIVIL ACTION NO. 08-0829**

**VS.**                                                  **JUDGE DOHERTY**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF THE SOCIAL**                           **MAGISTRATE JUDGE HILL**
**SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, it is

**RECOMMENDED** that Commissioner's decision be **AFFIRMED** and that claimant's case be

**DISMISSED**.

### *Background and Procedural History*

Born on April 19, 1967, Byron Benoit was 40 years old when his administrative hearing

took place on August 6, 2007. He left school after the eighth grade. (Tr. 616). Benoit last

worked as a diesel mechanic. (Tr. 617).

In 1995, Benoit was injured in a work-related accident when an electrical panel fell off of

a truck and pinned him to the ground. (rec. doc. 11). In that accident, Benoit suffered a fracture

of the great tuberosity of the right shoulder, rotator cuff tear, knee sprain, and internal

derangement of the left knee. (Tr. 7). Benoit underwent surgery in September, 1995, for rotator

cuff repair and decompression of the shoulder and was also treated for the knee injury. He was

awarded worker's compensation benefits which have now been discontinued. (Tr. 18).

In January, 2003, Benoit suffered a skull fracture as the result of a motorcycle accident which resulted in cervical fusion surgery, and he was placed in a halo vest. (Tr. 7, 620; rec. doc. 11, p.2). Benoit was hospitalized for several months. (Tr. 19). He has not worked since August 5, 1995.

On August 5, 2005, Benoit filed for social security benefits, alleging disability since January 1, 1995, due to a shoulder injury, a broken neck, left hand problems, and mental problems. (Tr. 65-67, 75). Following the hearing on August 6, 2007, (Tr. 611-643), an administrative law judge (ALJ) rendered an unfavorable decision, and Benoit requested review. (Tr. 7-11). The Appeals Council concluded on May 3, 2008, that there was no basis for review of the ALJ's decision. (Tr. 4-6). Thus, the ALJ's decision became the final decision of the Commissioner. Benoit now seeks review of this decision pursuant to 42 U.S.C. § 405 (g).

### Assignment of Error

Benoit raises the following error on appeal: the ALJ made erroneous conclusions in his analysis and interpretation of the medical evidence in denying benefits to claimant.

### Standard of Review and Procedure for Analysis of Impairments

The court's review is restricted under 42 U.S.C. § 405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 136 (5th Cir. 2000); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir.1992); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).[1] In determining whether a claimant is capable of performing substantial

---

[1] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Carey*, 230 F.3d at 136; *Anthony*, 954 F.2d at 292; *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991). The court may not re-weigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. *Carey*,

gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1992).[2]

When a mental disability claim is made, such as the depression and pain disorder alleged here, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments.

*Satterwhite v. Barnhart*, 44 Fed. Appx. 652 (5th Cir. 2002) (unpublished).[3]

In the instant case, claimant has not worked since his 1995 accident. At step two, the ALJ found that Benoit suffered from the following severe impairments: impingement tendinitis of right shoulder; bilateral patello-femoral pain syndrome; pain disorder associated with both

---

230 F.3d at 136; *Johnson v. Bowen* , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson*, 864 F.2d at 343.

[2] The procedure is as follows:
1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.
2. A person who does not have a "severe impairment" will not be found to be disabled.
3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
4. If a person can still perform his past work, he is not disabled.
5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

[3] For a succinct summary of the current law, see *Serrano-Diaz v. Barnhart*, 2004 WL 2431693, *6 (E.D.Pa. 2004).

psychological factors and general medical condition; depressive disorder; and adult adjustment disorder with anxiety. (Tr. 18). At step three, the ALJ found that Benoit's impairments did not meet any Appendix 1 Listing, either alone or in combination. (Tr. 23-25). At steps four and five, the ALJ determined that Benoit was not able to perform his past relevant work, but he retained the residual functional capacity to perform light work with the following non-exertional limitations: he cannot work over the shoulder on the right side; he can only occasionally interact with the general public, co-workers or supervisors; and, he can only perform simple non-complex job operations. (Tr. 25).

Thus, the ALJ found that Benoit would be considered "not disabled" under the Grids and, relying in part upon the testimony of a vocational expert, the ALJ concluded that there are jobs which Benoit can perform, such as assembler, laundry press operator, and garment folder, which exist in significant numbers in the national economy (Tr. 29). The ALJ thus concluded that Benoit was not disabled under the Act.

### *Administrative Record*

## I.    **Medical Evidence**

**A. <u>Dr. John Cobb, Lafayette Bone & Joint Clinic</u>**: Claimant presented to Dr. Cobb on June 21, 1995, with bilateral knee pain and right shoulder pain in connection with injuries he sustained in an on-the-job accident on April 3, 1995. (Tr. 557). Claimant indicated that he had completed some physical therapy after the accident and still had intense pain upon awaking every morning. Claimant stated that he "loosens up" and improves a little bit as the day goes by, but he has a lot of pain with abduction and rotation of the shoulder. Dr. Cobb noted marked tenderness, limitation in motion, and dysfunction of the rotator cuff, all of which indicated a

possible tear.  Xray showed a fracture of the greater tuberosity which was incompletely healed.  (Tr. 558).

Claimant had pain in both knees, but more on the left side, and the pain worsened upon squatting.  Dr. Cobb noted no instability in the knees but observed some degree of lateral tenderness.  Knee xrays showed signs of a possible fracture of the right knee which had healed, and no problems were noted with the left knee.  Claimant reported no neck pain.  Dr. Cobb's impressions were: 1) right shoulder fracture with possible rotator cuff tear; 2) right knee sprain which appeared to be healing; and 3) possible internal derangement of left knee, with possible peroneal nerve injury.[4]

On August 2, 1995, claimant presented to Dr. Cobb with burning knee pain.  (Tr. 556).  Dr. Cobb noted that claimant's MRI study failed to demonstrate any significant internal derangement, and his nerve studies showed no entrapment of the peroneal nerve.  As for claimant's shoulder, the MRI showed the fracture and a probable rotator cuff tear.  Dr. Cobb suggested surgical repair of the shoulder, which was performed.

On October 2, 1995, claimant returned to Dr. Cobb following shoulder surgery.  Dr. Cobb suggested physical therapy and noted that claimant complained of flashbacks and psychological difficulties.  (Tr. 555).  Dr. Cobb suggested claimant see Dr. Michael Berard.[5]  On October 30, 1995, Dr. Cobb's progress notes indicated that claimant was doing better with his knees and his shoulder.  He suggested physical therapy.  Progress notes from November 29, 1995, indicate that while claimant's knees and shoulder were still stiff and painful, he was

---

[4] Differential diagnosis of left knee would include a lateral miniscus tear.  (Tr. 558).

[5] Dr. Berard's medical report is summarized herein, beginning on page 20.

5

improving. (Tr. 554). Dr. Cobb again noted the need for claimant to participate in physical therapy for his shoulder and quadriceps.

On January 10, 1996, Dr. Cobb opined that because claimant was at an impasse with physical therapy on his right shoulder, he recommended, and subsequently performed, a manipulation under general anesthetic. (Tr. 553). Additionally, claimant still complained of pain in both knees. Dr. Cobb injected the left knee with Celestone. On January 26, 1996, claimant was making good progress after the shoulder manipulation and was still doing physical therapy for both the shoulder and knees. (Tr. 552). Dr. Cobb stated his belief that claimant would be able to return to his previous work once he was fully recovered from his injuries. On February 21, 1996, Dr. Cobb injected Celestone and Marcaine into claimant's shoulder and left knee.

On March 13, 1995, claimant's shoulder was better after taking time off from the therapy. (Tr. 551). He still had a trigger point in the left knee, and Dr. Cobb injected the site. On April 15, 1996, claimant was making progress but was still experiencing knee pain. Dr. Cobb recommended ionophoresis[6] for his knees, which claimant continued to receive in May, and also prescribed Lodine. (Tr. 550-1).

In June and July, 1996, claimant presented with intermittent pain in his knees as well as stiffness in the shoulder. Dr. Cobb indicated that claimant was probably suffering from chronic patello-femoral pain syndrome, and that claimant was unable to return to his previous work. (Tr. 548-9). Dr. Cobb was not ready to release him yet, and prescribed Axocet, Lodine, Pamelor, and Klonopin. Claimant rescheduled four appointments in September. (Tr. 546-8).

---

[6] In medical terms, iontophoresis is defined as the topical introduction of ionized drugs into the skin using direct current (DC). *www.steadyhealth.com*.

On September 30, 1996, claimant presented with a weakened rotator cuff. (Tr. 546). Dr. Cobb noted no impingement. Claimant reported that he had been having some difficulties with his work.[7] Dr. Cobb prescribed Lodine 500. Claimant rescheduled appointments in November and December, 1996, and stated that he had not been going to physical therapy. (Tr. 545). On December 6, 1996, a shoulder xray revealed that the area of the shoulder fracture had become enlarged almost to the point of having an exostosis.[8] (Tr. 544). Dr. Cobb noted that this could be causing some impingement, and he recommended surgical removal of the spur over the shoulder fracture, and surgery was apparently done shortly thereafter. On December 18, 1996, claimant did not show for his appointment. On March 12, 1997, Dr. Cobb cautioned claimant against doing "anything much in the way of activity" in order to give the cuff a few more weeks to heal. (Tr. 543).

On May 12, 1997, claimant was noted to be "doing pretty well with his shoulder." (Tr. 542). Dr. Cobb recommended physical therapy and anticipated being able to "finalize" claimant's care within three weeks. Claimant cancelled two appointments in June before seeing Dr. Cobb again on June 16, 1997, when claimant reported that after five (5) sessions of therapy, his shoulder was definitely moving better. (Tr. 540). At that visit, claimant's shoulder was tight, but no impingement was noted, and the range of motion was improved to 100 degrees. Dr. Cobb recommended two to three more weeks of therapy, after which time, treatment would be finalized.

---

[7] It is unclear from the record what type of work claimant was doing in 1996.

[8] Exostosis is a benign bony growth projecting outward from a bone surface. *www.medical-dictionary.thefreedictionary.com.*

After missing three appointments in July, claimant presented on August 18, 1997, with shoulder improvement but significant knee pain. (Tr. 538). Dr. Cobb found no effusion, and he suggested an MRI. The MRI showed no abnormality. On September 24, 1997, Dr. Cobb indicated that claimant's type of knee injury does not lend itself to any type of arthroscopic treatment; rather, it will be time related. (Tr. 537). Dr. Cobb stated that claimant needed some additional training and schooling so that he could secure a lighter job in the future since his previous job of diesel mechanic would be hard for him to handle.

After rescheduling several appointments, claimant presented on April 22, 1998, with pain in his upper right extremity when sleeping. (Tr. 533). He had developed ulnar nerve symptoms with complaints of burning and numbness into fourth and fifth fingers. Dr. Cobb indicated that claimant appeared to have ulnar entrapment syndrome which had developed at the elbow and was related to problems with claimant's right shoulder.[9] Dr. Cobb recommended EMG and nerve conduction velocities; the tests showed no lesion of the ulnar nerve. (Tr. 532).

Claimant did not see Dr. Cobb again until June 21, 1999, when he presented with continuing knee pain. (Tr. 530). Dr. Cobb noted a little bit of crepitation and just some generally diffuse pain, with the possibility of some chronic synovitis.[10] Dr. Cobb suggested three to four weeks of pool therapy.

On September 20, 1999, Dr. Cobb's noted that claimant "is basically back in for medication." (Tr. 528). Claimant reported that Lortab 2 upset his stomach, and he requested

---

[9] Ulnar nerve entrapment is a condition where the ulnar nerve becomes trapped or pinched due to some physiological abnormalities. *www.wikipedia.org.*

[10] Chronic synovitis is defined as chronic inflammation of the synovial membrane of a joint. *www.medical-dictionary.thefreedictionary.com.*

Lortab 7.5. Dr. Cobb gave him some Lortab but suggested that claimant "needs to taper off that and go to something over the counter." It was further noted that claimant could work on a self-directed therapy program with his knees and shoulder. Additionally, Dr. Cobb stated that claimant would most likely be able to function in a light work capacity, and he suggested that claimant "needs to move in that direction so he can get a suitable job."

On December 2, 1999, Dr. Cobb's notes indicate that Dr. Berard requested that claimant be re-evaluated for pain. Dr. Cobb reviewed his chart and referred claimant to Dr. Hodges for treatment of chronic pain and to prepare claimant to return to work. (Tr. 527). Dr. Cobb indicated that he had nothing further to offer claimant either orthopedically or surgically. Claimant was a no-show for an appointment with Dr. Cobb on October 3, 2001.

Claimant did not see Dr. Cobb again until January 9, 2006, when he presented for re-evaluation of pain in his right shoulder and bilateral knee pain. (Tr. 523-25). Claimant indicated that he had not been treated by any other physician since he was last seen by Dr. Cobb over four years ago. (Tr. 523). Claimant complained of burning, stabbing pains in his shoulder and both knees and also numbness in his right shoulder, arm and hand. (Tr. 523-4). Examination revealed limited range of motion in right shoulder and tenderness of the medial joint lines bilaterally in the knees. (Tr. 524). No crepitation, effusion, or instability was noted. Xrays of the knees were normal, and shoulder xrays demonstrated a dystrophic calcification[11] in the supraspinatus area, with no glenohumeral humeral changes. (Tr. 525). Dr. Cobb's impressions were: chronic bilateral knee pain with possible meniscus injury, post decompression of right shoulder with mild impingement, tightness of the inferior capsule of right shoulder, and probable

---

[11] Calcification of degenerated or necrotic tissue. *www.medical-dictionary.thefreedictionary.com.*

intermittent carpal tunnel syndrome.[12]  He recommended MRIs of both knees.  There is no

evidence in the medical record that additional MRIs were done.  Claimant was a no-show for his

appointment on March 1, 2006.  (Tr. 522).

Claimant's last visit with Dr. Cobb took place on March 22, 2006, when claimant

presented with complaints of trouble lifting things.  (Tr. 521).  The EMG and nerve conduction

studies of the upper right extremities were normal.  Some impingement of the right shoulder was

observed, and Dr. Cobb injected with DepoMedrol and Marcaine.  Claimant requested and was

given Lortab 7.5, and no return appointment was given.  It was reported that "patient is unable to

return to work."  On September 14, 2006, claimant called Dr. Cobb's office requesting a return

appointment, but he was instead referred to Dr. Hodges to help claimant manage his chronic

pain.  (Tr. 520).

   **B.  <u>Dr. Daniel L. Hodges, Lafayette Bone & Joint Clinic</u>**:  Claimant was referred to Dr.

Hodges by Dr. Cobb due to stinging and burning in his legs.  (Tr. 169).  He initial appointment

with Dr. Hodges was on June 4, 1998, but claimant arrived too late for testing to be done, and his

appointment was rescheduled for April 1, 1999.  (Tr. 174).  Claimant was a no-show for his

appointments on April 1 and April 21, 1999.  (Tr. 172-3)**.**  Claimant's first comprehensive

appointment with Dr. Hodges took place on January 10, 2000.  (Tr. 169-171).  Claimant reported

recurring shoulder and knee pain which originated from an on-the-job accident in April of 1995;

he also stated that he had undergone three shoulder surgeries related to that accident.  (Tr. 169).

Dr. Hodges suggested MRI's, and he also suggested that Dr. John Grimes, claimant's vocational

rehabilitation counselor, be called to assist claimant in job retraining.  (Tr. 170).  Dr. Hodges

---

[12] Later medical records from Dr. Gillespie indicate that electrical studies done by Dr. Hodges showed no entrapment neuropathy at the level of the carpal tunnel.

continued the then-current medications prescribed by Dr. Cobb, which were Klonopin (.5 mg),

Lortab (7.5), and Remeron.

Claimant presented with vehement complaints of pain in August, 2000, and in March,

2001, but Dr. Hodges noted that the knee and lumbar MRI's were both normal, and Dr. Hodges

was "at a loss to explain [claimant's] current symptomology." (Tr. 149, 157). Dr. Hodges

prescribed Celebrex, Paxil, which was later replaced by Prozac, and Viagra,[13] in 2000 and 2001.

(Tr. 149, 150, 160, 164). Despite the lack of objective findings to support his symptoms,

claimant insisted that "something is wrong" and continued to complain of knee pain in a

"vehement unrelenting fashion." (Tr. 149, 152). Claimant did not show up for, or call to cance,l

appointments with Dr. Hodges on the following dates in 2000: February 2, March 22, March 29,

April 24, May 17, June 27, July 24, September 12, October 3, and October 16; he also failed to

appear on December 9, 2002. (Tr. 153-173, 142).

On July 10, 2001, after claimant's recent bone scan results were found to be within

normal limits, Dr. Hodges suggested a return to work. (Tr. 147). On October 1, 2001, Dr.

Hodges reviewed claimant's Functional Capacity Evaluation performed by NovaCare which

recommended sedentary to light work duty conditions. (Tr. 146). Dr. Hodges agreed with

NovaCare's evaluation and planned to arrange a meeting with Glenn Guidry, claimant's

vocational rehabilitation manager, to coordinate return to work efforts.

Claimant was next seen by Dr. Hodges on June 12, 2002, with multiple peripheral

complaints of shoulder and neck pain as well as bilateral knee pain. (Tr. 144). Upon physical

examination, Dr. Hodges found no significant limitations and again re-iterated his opinion that it

---

[13] Progress notes state that sexual dysfunction is a direct side-effect of Paxil. (Tr. 150).

was time to "begin looking at a slow return to work effort." Dr. Hodges decreased claimant's Hydrocodone prescription to a 5mg dosage.

Claimant's final visit with Dr. Hodges was on October 10, 2002, when he presented with reports of a significant increase in pain. (Tr. 143). Claimant reported increased stress and anxiety due to the loss of his trailer in a recent storm and also family problems. Dr. Hodges increased claimant's dosage of Hydrocodone up to 7.5 mg and added low dose Xanax (.5mg) for anxiety. As stated above, claimant did not show for his appointment on December 9, 2002. (Tr. 142). On February 14, 2006, the EMG/NCV Report by Dr. Hodges indicated that claimant had an essentially normal EMG/NCV of the upper extremities with no clear cut finding to suggest entrapment neuropathy at a level of the carpal tunnel. (Tr. 598).

C. **Lafayette General Medical Center ("LGMC")**: Claimant was admitted to LGMC on October 29, 2002, after being involved in a motorcycle accident. (Tr. 108-119). Claimant was not wearing a helmet at the time of the accident. (Tr. 110). Claimant was "highly intoxicated and very belligerent" in the ER. Dr. Daniel J. Jurusz treated claimant in the ER and made the following diagnoses: 1) motor vehicle accident; 2) multiple right facial fractures; 3) left basiliar skull fracture; 4) alcohol intoxication; and 5) facial and hand abrasions. (Tr. 109). Claimant was treated for those injuries and discharged on November 1, 2002. His CAT scans were all normal, and he had no evidence of seizures. Claimant did not require any surgery. During his hospitalization, claimant never had any shortness of breath or complaints of abdominal pain, and his hematocrit remained stable.

Upon discharge, claimant was prescribed Lortab and a Solu-Medrol Dosepak. It was noted that since claimant did not have any general surgical issues, he did not need to follow up with Dr.

Jurusz.  He was ordered to follow-up with Dr. Duplechain in two weeks regarding his facial fractures.

**D.  Lake Charles Memorial Hospital ("LCMH")**:  Claimant was admitted to LCMH emergency room on January 6, 2003, for multiple trauma injuries resulting from a motorcycle accident.  (Tr. 177).  Claimant presented with neurologic injury with blood coming from his nares and clear fluid draining from his right ear.  He was also noted to have subcutaneous emphysema in the chest, fractured ribs, and a Type II odontoid fracture.[14]  (Tr. 177, 246).  He was taken into the operating room where he underwent an esophagoscopy and a bronchoscopy.  He also had bilateral chest tubes inserted which remained for five days, and he stayed in the intensive care unit during that time.  A CT scan revealed a laceration of the right lobe of the liver.  (Tr. 179, 208).  Spine films for the AP and lateral spine and thoracic spine were normal.  (Tr. 200-201).

After five days, claimant improved neurologically and became able to follow commands; he was then extubated and moved out of the intensive care unit and out to the floor.  Neurosurgery recommended that claimant be transferred to Shreveport to undergo surgery for stabilization of the odontoid fracture.  (Tr. 177).  The claimant took several weeks to have the transfer arranged, and during that time, he refused to wear his brace "even though he was well aware of the possibility of self-inflicted injury resulting in death" if he did not wear it.  (Tr. 177, 217, 245).  He tested positive for marijuana and benzodiazepines.  (Tr. 182, 185).  Doctors noted that claimant was combative and uncooperative.  (Tr. 191).

After approximately twenty (20) days, claimant was approved for transfer to Shreveport for surgery.  (Tr. 178).  Upon discharge, on January 26, 2003, claimant was breathing and ambulating

---

[14] Fracture in C1-C2 area of spine.  *www.emedicine.medscape.com.*

the halls without oxygen, and no plans for follow up were arranged by LCMC.

    **E.  LSU Health Science Center in Shreveport, LA ("LSUHSC"):**  Claimant was admitted to LSUHSC on January 26, 2003, for treatment of his Type II odontoid fracture.  (Tr. 438).  He was initially placed in a halo vest for immobilization of his fracture.  (Tr. 441).  Progress notes indicate that claimant removed every immobilization placed on him (halo, c-collar) and he remained noncompliant despite every effort by hospital staff to explain the risks of his lack of compliance.  (Tr. 450, 480, 484, 489).  Claimant was discharged on January 28, 2003, with instructions to wear a Miami J collar (Tr. 490); the Lortab he had been taking for pain was discontinued.  (Tr. 441).  Progress notes from a follow-up visit on February 10, 2003, indicate that fusion surgery was recommended for the odontoid fracture which was not healing properly.  (Tr. 435).  Claimant was instructed to refrain from taking narcotic medications, and instead, to take NSAIDs for his pain, such as ibuprofen.

    Claimant was admitted to LSUHSC in April, 2003, for a spinal fusion, but he cancelled the surgery himself.  (Tr. 411).  Claimant was re-admitted to LSUHSC on May 29, 2003, to undergo a spinal fusion at C1-C2 with wires which was necessitated by the nonunion of claimant's Type II odontoid fracture.  (Tr. 301, 328).  He was initially treated in a halo and then in a Miami J collar, both of which were self-discontinued.  (Tr. 301).  Claimant had previously refused other forms of immobilization.  (Tr. 328).  Claimant tolerated the fusion surgery well and was discharged on June 2, 2003.  (Tr. 301).

    At a follow-up exam on June 18, 2003, xrays of claimant showed evidence of the fracture healing, and progress notes indicated that claimant was doing well.  (Tr. 296-7).  Follow-up xrays were taken on July 23, 2003, and progress notes indicated that the odontoid fracture had healed.

(Tr. 294).  At that appointment, claimant indicated that he was not having any pain.  (Tr. 293).

Claimant did not keep his physical therapy appointment on July 29, 2003.  (Tr. 295).  His next visit was on January 21, 2004, and xrays showed a healed odontoid fracture with posterior fusion between C1 and C2.  (Tr. 292).  At that appointment, claimant indicated that he was not having any pain.  (Tr. 291).

At his final follow-up visit on May 19, 2004, xrays showed a C1-C2 fusion with further healing since claimant's last visit.  (Tr. 290).  The physician's notes stated that the odontoid was healed but remained translated anterior to the C2 vertebral body about 50%.

**F.  <u>Crowley Mental Health Center ("CMHC")</u>**:  Claimant was admitted to CMHC on April 28, 2004, due to his explosive, angry and destructive behavior.  (Tr. 491, 559).  Claimant was also experiencing a depressed mood, crying spells, increased anxiety, poor appetite, and frequent suicidal thoughts.  (Tr. 561).  Claimant stated that he experienced these symptoms daily.  Claimant reported that his mood was best when he was around his children, whom he had custody of every other weekend.  Claimant reported that he lived alone and enjoyed working in the yard around his pond.  (Tr. 564).

Upon evaluation by psychiatrist Kevin Young, claimant was diagnosed with Major Depressive Disorder, Single Episode, Severe, With Psychotic Features.  (Tr. 491).  A diagnosis of Post Traumatic Stress Disorder was also noted at that time.  Treatment included medication management and individual counseling.  Claimant admitted to using marijuana during his psychiatric evaluation on April 28, 2004.  (Tr. 569).  Upon testing, claimant did not have impairment of short term memory.  (Tr. 566).

On July 7, 2004, and also on August 11, 2004, progress notes indicate that claimant had a "brighter affect." (Tr. 497). No side effects of medication were noted on July 15, 2004. Claimant reported that he was getting out of the house more and that the Lexapro was making a significant difference. He stated that he was spending a great deal of time with his children that summer. (Tr. 496). On October 8, 2004, claimant complained about physical pain due to the rainy weather. Claimant reported that his mood was "better" and that he was getting out more.

In December, 2004, claimant reported feeling "happy" and had a bright affect. (Tr. 495). He was able to get out more, including a trip to Wal-Mart, was spending a lot of time with his children, and was sleeping well. He spent Christmas at his mother's house visiting with family.

On March 22, 2005, claimant stated that his medications were effective and that he was doing very well. (Tr. 494). He said that he had been hunting, fishing, and visiting with family and friends. In April, 2005, progress notes indicated that claimant's agitation and anxiety had become manageable and that anger outbursts no longer occurred.

Progress notes from May, 2005, indicate that claimant's diagnosis was changed from Major Depression, Single Episode, to Major Depression, Recurrent, Mild. (Tr. 493, 574). In July, 2005, claimant's mother reported that claimant had recently applied for SSI benefits because of his physical health issues. It was noted that claimant's emotional health issues had been resolved since his medication change in November, 2004. On August 10, 2005, claimant denied having the crying spells, death wishes, and feelings of hopelessness or worthlessness that he used to experience. (Tr. 492).

In the nurse's correspondence dated September 21, 2005, it was noted that claimant had responded well to his treatment at CMHC; due to his significant progress, he no longer required

individual counseling and was in a medication management group. (Tr. 491). His medications at that time were Vistaril 50 mg twice a day for anxiety and Lexapro 20mg each morning for depression. Progress notes from the summer of 2006 indicate that claimant was doing well. (Tr. 576). On August 2, 2006, claimant's GAF score was noted as 51.

In the nurse's correspondence dated November 21, 2006, it was noted that claimant's depressive symptoms were well under control, and his condition had stabilized to a level at which his family physician could continue to follow him for continuity of care. (Tr. 559). In January of 2007, progress notes stated that claimant was sleeping well. (Tr. 576). On claimant's final visit to CMHC, it was noted that he was doing well and that his medications remained effective. (Tr. 575).

**G. Dr. Joseph T. Gillespie of Conservative Pain Management**: Claimant was referred to Dr. Gillespie by Dr. Cobb on October 23, 2006, when he presented with right shoulder and bilateral knee pain. (Tr. 594). Claimant reported that the pain was constant, but he had good days and bad days, and the pain was better when he exercised. He noted that he was not working because he was disabled. He indicated that he had not tried to work since his on the job accident in 1995, and he felt that he could not work at all due to his pain. Claimant's medications at that time were Lexapro, an asthma inhaler, Tylenol, and BC powder. (Tr. 595).

Dr. Gillespie recommended a wellness program and vocational rehabilitation, and he indicated that claimant should be able to do light to medium activity. (Tr. 591, 595). Dr. Gillespie stated that claimant was at maximal medical improvement and that there was "some symptom magnification." (Tr. 591). Dr. Gillespie prescribed Voltaren 75mg and Lortab 7.5. (Tr. 591).

Claimant presented on November 28, 2006, with shoulder pain, knee pain, and poor sleep. (Tr. 588). Elavil was prescribed. On January 29, 2007, claimant presented with right shoulder and

arm pain as well as knee pain. (Tr. 580). His current medications were Lexapro, Tylenol, and BC powder. On May 27, 2007, claimant presented with shoulder pain and was injected with DepoMedrol and Bupivacain. (Tr. 578). He listed his medications as Lortab, Elavil, and Voltaren. (Tr. 577). Claimant stated that he exercised by caring for his fruit trees, and he indicated that his appetite and sleeping patterns were good.

**H. Michael Berard, Ph.D., M.P. (clinical/medical psychologist)**: Claimant was referred to Dr. Berard by his attorney for consultation on April 26, 2007. (Tr. 600-610). Dr. Berard indicated in his medical summary that he had previously seen claimant in November, 2005, but those progress notes are not in the record. (Tr. 600). Claimant was revealed to have the potential of functioning on the "low average range of measured intelligence with an acquired Full Scale IQ of 84." (Tr. 600). Dr. Berard found that claimant had significant deficits in the construct identified as "Freedom from Distractability" and that this finding was consistent with an individual suffering from symptoms of depression and anxiety which interfered with peak cognitive functioning. (Tr. 601). Dr. Berard's diagnosis was Pain Disorder, Cognitive Disorder, Depressive Disorder, and Adult Adjustment Disorder. (Tr. 609). He recommended continued outpatient therapy and psychotropic medications which the claimant was already being prescribed. (Tr. 610).

Dr. Berard stated his opinion that claimant's "unresolved orthopedic and neurological injuries" have significantly compromised his quality of life to the extent that "this individual is at risk in any employment setting." (Tr. 602). Further, Dr. Berard opined that "it would be unreasonable to expect that [claimant] could function with any degree of reliability in accordance to (*sic)* traditional labor standards." Dr. Berard stated his opinion that claimant was "completely disabled" without offering any independent, objective findings to support his claim. Dr. Berard

further stated that claimant "will need psychiatric treatment for the rest of his life."

## II.    ALJ Hearing

**A. <u>Byron Benoit</u>**:  During his hearing on August 6, 2007, claimant informed the ALJ that he had worked for years as diesel mechanic but quit work due to his on the job accident.  (Tr. 617). He stated that he had looked for work in the past, but that after his motor vehicle accidents, he stopped.  (Tr. 619).

He testified that he lives alone with his two dogs.  (Tr. 615, 625).  He does not socialize much, and his mother comes by every day and helps him.  (Tr. 628).  His mother does his grocery shopping, and he sometimes goes with her, although she will not let him carry anything heavier than a loaf of bread.  (Tr. 622).  He denied doing any yard work.  He said that he has not fished or hunted in years.  (Tr. 623).  He testified that he likes to read, cook, and walk.  (Tr. 624).  He said that he walks up to two hours per day because it makes his body feel better, as does the cooking. He also spends time with his four children, who range in age from age 13 to 21 years.  (Tr. 623-4). He sometimes volunteers at a church, but all he can do is haul empty boxes.  (Tr. 628).

He denied any improvement in his physical condition after treating with Drs. Cobb, Gillespie, and Hodges.  (Tr. 618).  He stated that physical therapy did help him.  He reported no real problems with sitting, can walk for 45 minutes at a time, and cannot lift over ten or fifteen pounds.  (Tr. 619).

Claimant testified that he has had problems with depression after his injuries and that he cries a lot.  (Tr. 625).  He stated that he cannot tie his shoelaces due to having a stroke on his left side.[15]  (Tr. 626).  He indicated that after the stroke, he had to learn to walk again.  Claimant could

---

[15] There is no evidence in the medical record of claimant ever having a stroke.

not remember when he had suffered the stroke. He stated that he had not been to physical therapy after the stroke.

Claimant testified that he was currently taking medications for arthritis, pain, and depression, but he could not remember any of the medications by name. (Tr. 627). Claimant testified that he could not lift his right arm up all the way like he wants to, and that his arm gets shaky sometimes. (Tr. 629). He stated that he used a cane sometimes.[16] (Tr. 630). Claimant testified that he has less than full range of motion in his neck, specifically when he is exercising. (Tr. 633). He also said he has a lot of pain in his neck and suffers from headaches for which he takes BC powder. Claimant also testified that his depression comes and goes, and that he has memory problems. (Tr. 634).

**B. Priscilla Louviere (claimant's mother)**: Claimant's mother corroborated his testimony, stating that he has pain all the time in his shoulder and his knees. (Tr. 636). She stated that claimant falls a lot and cries all the time. (Tr. 636-7). She testified that she did not see any improvement in claimant after he was seen at Crowley Mental Health. (Tr. 638). She testified that claimant takes the following medications: Hydrocodone, Diclofenac, and Amitriptyline for sleeping. (Tr. 637).

**C. Wendy P. Klamm, vocational expert**: The vocational expert ("VE") testified that claimant's past work experience as a diesel mechanic helper is a medium, semiskilled job, and his experience as a diesel mechanic is a heavy, skilled job. (Tr. 640). The ALJ gave VE the following hypothetical:

---

[16] Nowhere in the record does any physician mention that claimant needs a cane.

If we had someone of claimant's age, education, work experience, and assume he could lift and carry 20 pounds occasionally, 10 pounds frequently; he couldn't do any over-shoulder work; he could stand and walk for six hours in an eight-hour day and could also sit for six hours; and, because of emotional problems, he couldn't do complex work; and he needed a work environment with limited interaction with the general public, where he's more comfortable working with things rather than people, would there be jobs he could do?

The VE testified that claimant would not be able to do his past relevant work, because those jobs are greater than light duty, and also they are semiskilled and skilled jobs. (Tr. 641). The VE indicated that claimant could do any of the following jobs, all of which are available in the state and national economy: small products assembler, laundry press operator, and garment folder. The VE testified that if claimant had physical problems which caused him to miss four or five days per month, or if he had depressive problems which might interfere with his ability to attend at that level or concentrate, then he could not do those jobs. (Tr. 641-2).

### *Analysis*

Claimant maintains that substantial evidence does not support the ALJ's conclusion that he can perform sustained gainful employment. Claimant contends, *inter alia*, that the ALJ did not give proper weight to the opinions of his consultative physician, Dr. Berard, and erred in discounting claimant's complaints of pain.

### *Did the ALJ properly weigh the medical evidence?*

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ultimate issue of disability is reserved to the Commissioner. The ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their opinions accordingly. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez v.*

*Chater*, 64 F.3d 172, 175-176 (5th Cir. 1995), *quoting Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

Here, the ALJ did **not** give any weight to the consultative opinion of Michael Berard, Ph.D., a clinical psychologist who examined claimant in November, 2005, and again on April 26, 2007. (Tr. 600-610). The ALJ's summary rejection of Dr. Berard's opinion is supported by substantial evidence in the record.

Dr. Berard stated his opinion that claimant's "unresolved orthopedic and neurological injuries" have significantly compromised his quality of life to the extent that "this individual is at risk in any employment setting." (Tr. 602). However, there is no diagnostic testing or any other objective findings in the record which support this opinion. Dr. Berard saw claimant on a consultative basis, and his psychological examination of claimant is not entitled to more weight than that of claimant's treating physicians, none of whom have suggested that claimant is unable to return to work.

Claimant underwent several successful surgeries on his neck and shoulder. He had residual limited range of motion with his shoulder, but nerve studies conducted by Dr. Cobb[17] were normal. (Tr. 524, 532). Dr. Cobb noted in 1997 that claimant's shoulder had improved to the point where he anticipated being able to finalize care within three weeks. (Tr. 542). In 1999, Dr. Cobb indicated that claimant was "basically back in for the medication" and that he had nothing further to offer claimant either orthopedically or surgically. (Tr. 528). Dr. Cobb suggested that claimant needed to move in the direction of getting a suitable, light duty job and referred him to Dr. Hodges for pain treatment so that claimant could prepare to return to work. (Tr. 527-8).

---

[17] Dr. Cobb, an orthopedic surgeon, was one of claimant's treating physicians.

Claimant did not return to Dr. Cobb until 2006, at which time, Dr. Cobb noted 2+ Waddell's signs indicative of some symptom exaggeration. (Tr. 524).

Another one of claimant's treating physicians, Dr. Hodges, stated on July 10, 2001, and again on June 12, 2002, that claimant was ready for a "slow return to work." (Tr. 144, 147). Similarly, Dr. Gillespie, another one of claimant's treating physicians, stated on October 23, 2006, that claimant would be able to function at light to medium activity. (Tr. 580). Dr. Gillespie also opined that claimant was at maximal medical improvement. (Tr. 591).

Concerning his mental health, progress notes from CMHC indicated that claimant's mental condition had improved and stabilized to the point where he no longer needed counseling, and he was released to his primary care physician for continuity of care in 2007. (Tr. 559). The progress notes clearly stated that claimant's depressive symptoms were well controlled with medications.

Thus, the undersigned finds that the ALJ showed good cause for rejecting Dr. Berard's opinion regarding disability. The ALJ's decision not to assign any weight to Dr. Berard's consultative opinion, and instead to give claimant's treating physicians' opinions controlling weight, is supported by substantial evidence in the record. The ALJ's opinion is entitled to deference.

### *Credibility of Claimant*

A claimant's subjective complaints of pain must be corroborated at least in part by objective medical testimony. *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). "Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make." *Van Horn v. Shweiker*, 717 F.2d 871, 873 (3rd Cir. 1983). To prove disability resulting from pain, claimant must establish a medically determinable

impairment that is capable of producing pain. *Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995). Disabling pain must be constant, unremitting, wholly unresponsive to therapeutic treatment, and corroborated in part by objective medical testimony. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

In this case, the ALJ found that claimant's impairments could reasonably be expected to produce some symptoms, but that claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. (Tr. 28). Two of claimant's main treating physicians concluded that claimant's subjective level of pain did not appear to be supportable by the objective medical findings. Dr. Gillespie opined that there was "some symptom magnification" by claimant. (Tr. 591). Dr. Hodges, upon finding xrays and MRI's of claimant's knees to be completely normal, was "at a loss to explain [claimant's] current symptomology." (Tr. 149, 157). Morever, his activity level, including the ability to hunt, fish, and walk for as long as two hours per day, belies his claim of total disability.

It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir. 1990) (per curiam). The record in this case is replete with evidence of claimant's physical ability to be active in his daily life, despite his claims to the contrary.

Claimant testified at his ALJ hearing that he had not been able to fish or hunt for years. However, he indicated in March, 2005, at an outpatient visit to CMHC, that he had been hunting, fishing, and visiting with family and friends. (Tr. 494). He also indicated in 2007 that he exercised by tending to fruit trees. (Tr. 577). Additionally, claimant testified at the ALJ hearing that he walked every day, sometimes continuously for forty-five minutes, because being active

made him feel better. (Tr. 624). Claimant admitted that, sometimes, he walks as much as two hours per day. Claimant also admitted that he cooks occasionally. The ALJ found that claimant's activities were not limited to the extent that one would expect with claimant's complaints of disabling symptoms and limitations.

Accordingly, the ALJ concluded that claimant was not entirely credible. The undersigned finds that the severity of claimant's reported pain is disproportionate to the objective medical evidence, and thus concludes that the ALJ's determination that claimant was not credible is supported by substantial evidence in the record.

Based on all of the medical evidence and testimony given, the ALJ determined that, both from a physical and mental health standpoint, claimant was not totally disabled, but rather, he retained the residual functional capacity to perform a limited range of unskilled light and/or sedentary work. This finding was supported by several medical opinions in evidence. Dr. Berard's opinion notwithstanding, there is no evidence in the record to support a finding of total inability to work in this case.

While the medical record clearly shows that claimant's medical problems are serious, the overwhelming evidence shows that claimant's impairments are not so severe as to render him completely unable to work. While he may be unable to return to his previous work as a diesel mechanic, a job which is considered medium duty, his physicians indicated that he would be able to return to a light-duty job, and the overwhelming weight of the objective findings and test results of his examining physicians, as well as the record evidence as a whole, supports this opinion.

As the ALJ's hypotheticals to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant's representative had the opportunity to

correct any deficiencies in the ALJ's questions, the ALJ's findings are entitled to deference. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). Considering the foregoing, the undersigned finds that the ALJ's determination that claimant could perform light duty work is supported by substantial evidence.

### Conclusion

For the foregoing reasons, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED** and that claimant's case be **DISMISSED.**

Under the provisions of 28 U.S.C. Section 636(b)(1)(c) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

Signed September 2, 2009, at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE